**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| TOWN OF BOONSBORO, MARYLAND, | MDL No.: 2873 |
| Plaintiff, | |
| | Master Docket: 2:18-mn-2873-RMG |
| v. | |
| | JUDGE RICHARD M. GERGEL |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); | Civil Case No.:    2:23-cv-02615-RMG |
| ANGUS FIRE; | DIRECT FILED COMPLAINT AND |
| AGC CHEMICAL AMERICAS, INC.; | JURY DEMAND PURSUANT TO CASE |
| AGC INC. F/K/A ASAHI GLASS CO.; | MANAGEMENT ORDER |
| ARCHROMA MANAGEMENT LLC; | NO. 3 |
| ARCHROMA US, INC.; | |
| ARKEMA INC.; | |
| BASF CORPORATION; | |
| BUCKEYE FIRE PROTECTION CO.; | |
| CARRIER GLOBAL CORPORATION; | |
| CHEMDESIGN PRODUCTS, INC.; | |
| CHEMGUARD, INC.; | |
| CHEMICALS INC.; | |
| CHUBB FIRE, LTD.; | |
| CLARIANT CORP.; | |
| CORTEVA, INC.; | |
| DEEPWATER CHEMICALS, INC.; | |
| DOE DEFENDANTS, JOHN 1-49; | |
| DUPONT DE NEMOURS, INC.; | |
| DYNAX CORP.; | |
| E.I. DU PONT DE NEMOURS & COMPANY; | |
| KIDDE PLC INC.; | |
| NATIONAL FOAM, INC.; | |
| NATION FORD CHEMICAL COMPANY; | |
| RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); | |
| THE ANSUL COMPANY; | |
| THE CHEMOURS COMPANY; | |
| THE CHEMOURS COMPANY FC, LLC; | |
| TYCO FIRE PRODUCTS, LP; | |
| UTC FIRE & SECURITY AMERICAS CORPORATION, | |
| Defendants. | |

## PLAINTIFF'S COMPLAINT

Plaintiff Town of Boonsboro, Maryland ( "Plaintiff"), by and through its undersigned

counsel, brings this action against Defendants 3M Company, E. I. DuPont De Nemours and

1

Company, The Chemours Company, The Chemours Company, FC, LLC, Chemguard, Inc., Tyco Fire Products, LP, Ansul Company, National Foam Inc., Angus Fire Armour Corporation, Buckeye Fire Equipment Company, AGC Chemical Americas, Inc., AGC Inc. f/k/a Asahi Glass Co.,  Archroma Management LLC, Archroma US, Inc. Arkema Inc., BASF Corporation, Carrier Global Corporation, ChemDesign Products, Inc., Chemicals Inc., Chubb Fire, LTD., Clariant Corp., Corteva, Inc., Deepwater Chemicals, Inc., DuPont De Nemours, Inc., Dynax Corp., Kidde PLC Inc., Nation Ford Chemical Company, Raytheon Technologies Corporation f/k/a United Technologies Corporation, and UTC Fire & Security Americas Corporation (collectively, "Defendants"). Plaintiff, based on information, belief and investigation of Counsel, alleges as follows:

## I.    SUMMARY OF THE CASE

1.      Plaintiff brings this action against Defendants to recover the considerable costs and damages that have incurred—and that will inevitably continue to incur—as a result of the presence of toxic compounds, identified as per- and polyfluoroalkyl substances ("PFAS"), in Plaintiff's public water supply.

2.      Plaintiff's water is supplied by both groundwater wells and natural springs, all considered groundwater under the influence of surface water.

3.      This Complaint refers to Plaintiff's wells, springs, water sources and supply, intakes, piping and delivery system infrastructure, including any treatment systems and other facilities, collectively as "Plaintiff's Property."

4.      Plaintiff's Property is currently contaminated with highly toxic PFAS compounds including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"). PFOA and PFOS have long been manufactured as components for aqueous film-forming foam ("AFFF")—a product used to control and extinguish aviation, marine, fuel, and other shallow spill fires.

2

5.      PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegrade, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy- induced hypertension and preeclampsia, and cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[1]

6.      Upon information and belief, at various times throughout the 1960s to present date, Defendants designed, manufactured, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or AFFF containing PFOA, PFOS, and/or their chemical precursors (collectively, "Fluorosurfactant Products") throughout the United States, including in Maryland.

7.      At all relevant times, upon information and belief, Defendants knew, or reasonably should have known, about the inherent risks and dangers involved in the use of PFAS compounds in their products—including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sell, and otherwise place Fluorosurfactant Products into the U.S. stream of commerce for decades, all while knowing PFAS compounds would be inevitably released into the environment—for instance, in the use of AFFF for fire protection, training, and response activities,

---

[1] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document No. 822-R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 8, 2023); *see also* EPA, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*, EPA Document Number: 822-R-16-005 (May 2016) at 16, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OM4O.txt (last accessed May 8, 2023).

even when used in the manners directed and intended by the manufacturer—and to conceal their knowledge of the risks involved.

8.     At all relevant times, Plaintiff did not know, nor should it have reasonably known, of the ongoing contamination of its Property by Defendants' Fluorosurfactant Products, as Defendants did not disclose the toxic nature and harmful effects of their Fluorosurfactant Products.

9.     As a result of Defendants' unreasonable acts and omissions, PFAS compounds have migrated through the soil and into the groundwater, have entered critical water sources relied upon by Plaintiff to provide for its citizens and customers, and have contaminated Plaintiff's Property— thereby subjecting Plaintiff, its customers, and the general public to the inherent danger of these chemicals. As the manufacturers and sellers of Fluorosurfactant Products, Defendants are responsible for the PFAS contaminants released into Plaintiff's Property.

10.     Through this action, Plaintiff now seeks to recover all available damages arising from the continuous and ongoing contamination of Plaintiff's Property caused by Defendants' actions as asserted herein. Such damages include, but are not limited to, the past and future incurred costs associated with the investigation, remediation, restoration, monitoring, and treatment of Plaintiff's Property.

## II.     PARTIES

A.     _PLAINTIFF_

11.     Plaintiff is a municipal corporation in Maryland with its office located 21 North Main Street, Boonsboro, Maryland, 21713.

12.     Plaintiff owns and operates a public drinking water system pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300(f)(15), and the reporting system of the U.S. EPA.

13.     Plaintiff's water system draws raw water from two groundwater wells and two

natural springs to distribute finished drinking water to consumers within its service area.

14.   Plaintiff has a property interest in the water it appropriates, treats, stores, and distributes to the public, as well as an interest in Plaintiff's Property.

15.   The First Hose Company of Boonsboro provides fire and emergency services in the Town and the surrounding communities.  Upon information and belief, AFFF was used for fire-fighting and training activities in areas surrounding Plaintiff's water sources.

B.   DEFENDANTS

16.   Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have contaminated and continue to contaminate Plaintiff's Property, causing irreparable harm.

17.   **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

18.   3M is the only company that manufactured and/or sold AFFF containing PFOS.

19.   **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

20.   **AGC AMERICA:** Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201,

5

Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

21.     **ANGUS:** Defendant Angus Fire maintains corporate headquarters in Bentham, United Kingdom. Angus Fire manufactured, marketed and sold AFFF products that contained PFOA.

22.     **ANSUL:** Defendant Ansul Company is a corporation organized and existing under the laws of the State of Wisconsin. This Defendant manufactured, marketed, and sold AFFF products that contained PFOA.

23.     **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

24.     **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

25.     **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

26.     **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

27.     **CARRIER:** Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

28.     **CHEM INC.:** Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

29.     **CHEMDESIGN:** Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

30.     **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

31.     **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

32.     In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

33.     **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability

company that conducts business throughout the United States. Its principal place of business is

1007 Market Street Wilmington, Delaware, 19899.

34.     **CHUBB:** Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited

company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon

information and belief, Chubb is registered in the United Kingdom with a registered number of

134210. Upon information and belief, Chubb is or has been composed of different subsidiaries

and/or divisions, including but not limited to Chubb Fire & Security Ltd., Chubb Security, P.L.C.,

Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Chubb is part of UTC

Climate, Controls & Security, a unit of United Technologies Corporation.

35.     **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York

corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North

Carolina 28205.

36.     **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with

its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

37.     **DEEPWATER:** Defendant Deepwater Chemicals, Inc. ("Deepwater") is a

Delaware corporation with its principal place of business located at 196122 E County Road 40,

Woodward, Oklahoma 73801.

38.     **DUPONT:** Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a

corporation organized and existing under the laws of the State of Delaware with its principal place

of business located at 974 Centre Road, Wilmington, Delaware 19805.

39.     **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a

DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974

Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017

as a result of the merger of Dow Chemical and DuPont.

8

40.     Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

41.     Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

42.     **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

43.     **KIDDE PLC:** Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

44.     **NATIONAL FOAM:** Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus Fire brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). This Defendant manufactured and sold AFFF that contained PFOA.

45.     **NATION FORD:** Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

46.     **RAYTHEON TECHNOLOGIES CORP.:** Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

47.     **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

48.     Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

49.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

50.     **UTC:** Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC was a subsidiary of United Technologies Corporation.

51.     Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which

time the Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

52.     All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of Maryland.

53.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

54.     The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.     JURISDICTION & VENUE

55.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants. The Plaintiff is in Maryland, but no Defendant is a citizen of Maryland or has its principal place of business in Maryland.

56.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3").  Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the District of Maryland. Further, in

accordance with CMO 3, Plaintiff hereby designates the United States District Court for the District of Maryland as the "Home Venue" as this case may have originally been filed there.

57.     Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

A.    *THE PFAS CONTAMINANTS AT ISSUE: PFOA AND PFOS*

58.     Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

59.     PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

60.     PFOA and PFOS are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

61.     Both PFOA and PFOS are readily absorbed in animal and human tissues after oral

exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[2]

62.    Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

63.    Notably, from the time these two compounds were first produced, information has since emerged showing negative health effects caused by exposure to PFOA and PFOS. According to the EPA, "studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).[4] The EPA has warned that there is suggestive evidence of the carcinogenic potential for PFOA and PFOS in humans.[5]

64.    Additionally, the EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an

_____

[2] *See* note 1, *supra.*

[3] *See id.*

[4] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OR9W.txt (last accessed May 8, 2023).

[5] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 11, 2023).

airfield at which [PFOA/PFOS] were used for firefighting."[6]

65.     EPA continues to research the effects of PFAS.  In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).  EPA therefore announced new Interim Updated Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[7]

B.     *AQUEOUS FILM-FORMING FOAM (AFFF) WAS A PRODUCT CONTAINING PFOS AND/OR PFOA AT THE RELEVANT TIME PERIOD*

66.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

67.     Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

68.     The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

---

[6] *See* note 4, *supra*.

[7] EPA, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)*, Document Number 822-F-22-002, available at  https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P10154ST.txt (last accessed May 8, 2023).

69.     When used as the Defendants intended and directed, the AFFF manufactured and/or sold by the Defendants released PFOA and/or PFOS into the environment.

70.     Once PFOA and PFOS are free in the environment, they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

71.     Notably, AFFF can be made without PFOA and PFOS. As such, fluorine-free foams do not release PFOA and/or PFOS into the environment.

72.     Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to the ongoing contamination and damages to Plaintiff's Property.

73.     Defendants' Fluorosurfactant Products have been used for their intended purposes in the process of fire protection, training, and response activities within for many years. During these activities, Defendants' Fluorosurfactant Products were used as directed and intended by the manufacturer, which allowed PFOA and PFOS to migrate through the subsurface and into the groundwater, enter into Plaintiff's property, thereby contaminating Plaintiff's wells and property, as well as causing other extensive and ongoing damages to Plaintiff's Property.

74.     Due to the chemicals' persistent nature, among other things, these chemicals have caused, and continue to cause, significant injury and damage to Plaintiff and Plaintiff's Property.

C.     DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF THE DANGERS INVOLVED

75.     On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS migrate

15

through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

76.    At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

77.    For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[8]

78.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

79.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and

---

[8] *See* Office of Minnesota Attorney General, Exhibit List, No. 1588, Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1588.pdf (last accessed May 8, 2023).

1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[9]

80.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[10]

81.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

82.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 N, for use in the manufacturing of AFFF products.

83.    On information and belief, in 2001 DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

---

[9] *See* DuPont, *C-8 Blood Sampling Results,* available at
https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC4
9KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0OMC4wLjAuMA..&_ga=2.26293428.885409355.1683587869-
581783177.1682689989 (last accessed May 8, 2023).

[10] *See* 3M, Internal Memorandum, *Organic Fluorine Levels,* (August 31, 1984), available at
https://static.ewg.org/files/226-
0483.pdf?_gl=1*1u237yp*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC49KT*MTY4MzU4Nzg2OC4y
LjEuMTY4MzU4Nzk0OMC4wLjAuMA..&_ga=2.39402538.885409355.1683587869-581783177.1682689989 (last
accessed May 8, 2023).

84.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[11]

85.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[12]

86.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[13] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[14]  By October 2012, the C8 Science Panel had notified DuPont of a probable link

---

[11] EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed May 8, 2023).

[12] *Id.*

[13] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease. *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed May 8, 2023).

[14]  *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf  (last accessed May 8, 2023).

between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

87.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its Perfluorinated chemical liabilities into the lap of the new Chemours.

88.    Notwithstanding their respective knowledge of the dangers involved with AFFF containing PFOA and/or PFOS, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or sold AFFF containing PFOA and/or PFOS; (2) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil and/or waste water disposal systems), thus improperly permitting PFOA and/or PFOS to contaminate soil and groundwater; (3) failed to recall and/or warn users of AFFF, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the AFFF containing PFOA and/or PFOS.

89.    As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's Property has been contaminated, and will continue to be contaminated, with PFOA and PFOS. This has created a significant environmental and public health hazard until such contamination may be remediated. As a direct and proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA and PFOS contamination of its Property at significant expense, loss and damage to Plaintiff.

90.    Defendants had a duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential

human health and environmental impacts before they sold such products, but they breached this duty. Defendants moreover breached their duty to minimize the environmental harm caused by PFOA and PFOS. Moreover, Defendants failed to warn Plaintiff of the known risks for environmental and health hazards arising from the usage of Defendants' Fluorosurfactant Products in their intended manner for its intended purpose.

D.    *OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM PFAS LIABILITIES*

91.    By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

92.    Upon information and belief, by 2013, to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

93.    In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

94.    At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

95.    Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately

prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

96.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

97.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

98.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

99.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

100.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

101.     Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

102.    In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

103.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

104.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

105.    Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

106.    Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

E.    *THE HARM TO PLAINTIFF RESULTING FROM PFOA AND PFOS CONTAMINATION*

107.    PFAS compounds, including PFOA and PFOS, have been detected in water extracted from Plaintiff's water sources. On at least one occasion, PFAS have been present at levels above EPA's Health Advisory Levels for PFOA and PFOS.[15]

108.    The detection and/or presence of PFOA and PFOS, and the threat of further

---

[15] *See* note 7, *supra*.

detection and/or presence of PFOA and PFOS, in Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant injury and damage to Plaintiff. It is the contention of Plaintiff that any detectible level of PFOA and/or PFOS in its groundwater source, well water, or elsewhere on its property requires investigation, remediation, and monitoring.

109.    Plaintiff has conducted and continues to conduct sampling, studies, and investigations related to PFAS, which requires funding by Plaintiff, including costs to conduct sampling, costs for its personnel to supervise the assessments, costs to develop PFAS treatment approaches, and costs to analyze available alternatives.

110.    The invasion of Plaintiff's Property with PFOA and PFOS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiff's Property each day—the result of which is a new harm to the Plaintiff and its Property in each occurrence.

111.    The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean supplies of fresh drinking water on which Plaintiff's wells depend. Plaintiff's interests in protecting the quality of its citizens' limited drinking water supplies constitutes a reason for seeking damages sufficient to restore such drinking water supplies to their pre-contamination condition.

112.    Through this action, Plaintiff seeks to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from continuous and ongoing contamination of Plaintiff's Property by Defendants' Fluorosurfactant Products. Such damages moreover include, but are not limited to, the past and future incurred costs associated with the investigation, remediation, restoration, monitoring, and treatment of Plaintiff's Property.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY- DEFECTIVE DESIGN**

113.    Plaintiff realleges the allegations set forth in all preceding paragraphs.

114.    Defendants were in the business of producing, making, fabricating, constructing, designing, marketing, and selling Fluorosurfactant Products including AFFF containing PFOA and/or PFOS.

115.    All of Defendants' Fluorosurfactant Products were manufactured for placement into trade or commerce.

116.    Defendants marketed and sold AFFF for use in controlling and extinguishing aviation, marine, fuel and other shallow spill fires.

117.    As a manufacturer, each Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

118.    Defendants' Fluorosurfactant Products were not reasonably safe as designed at the time the products left Defendants' control.

119.    Fluorosurfactant Products are unreasonably dangerous for intended and reasonably anticipated uses for the following reasons:

a.    PFOA and PFOS cause extensive groundwater contamination, even when used in their foreseeable and intended manner;

b.    Even at extremely low levels, PFOA and/or PFOS render drinking water unfit for consumption;

c.    PFOA and/or PFOS pose significant threats to public health; and,

d.    PFOA and/or PFOS create real and potential environmental damage.

120.    Defendants knew, at the time the products were manufactured, that

Fluorosurfactant Products were not safe because of these risks associated with PFOA and PFOS and failed to use reasonable care in the design of its AFFF products.

121.    Defendants knew that Fluorosurfactant Products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of the risks to human and environmental health.

122.    At all times, Defendants could make AFFF that did not contain PFOA/PFOS.  Feasible alternatives were available to Defendants, which would have eliminated the unreasonable dangers and hazards posed by Fluorosurfactant Products.

123.    Any utility allegedly provided by the use of Fluorosurfactant Products is greatly outweighed by the risks and dangers associated with their use.  The risks posed by PFOA/PFOS-containing AFFF far outweigh the products' utility as a flame-control chemical.

124.    The likelihood that PFOA and/or PFOS-containing AFFF would be spilled, discharged, disposed of, or released onto land and contaminate the Plaintiff's Property and the gravity of that damage far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

125.    Defendants' Fluorosurfactant Products were placed in the stream of commerce and sold in a defective and unreasonably dangerous condition in that they were toxic, persistent, bioaccumulative, and, when used as intended, resulted in contamination of soil, groundwater, and other water resources, including Plaintiff's Property.

126.    PFAS reached the Plaintiff's Property without any substantial change in condition and were in the same condition at the time of the alleged injury to the Plaintiff's Property.

127.    It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach soil, groundwater, and other resources, including Plaintiff's Property.

128.    Contamination of the Plaintiff's Property occurred because of the defective design and manufacture of AFFF.

129.    Defendants' PFAS caused and continue to cause injury to Plaintiff.

130.    Defendants are under a continuing duty to act to correct and remediate the injuries its conduct has introduced, and to warn Plaintiff, its customers, and the public about the human and environmental risks posed by PFAS, and each day on which it fails to do so constitutes a new injury to Plaintiff.

131.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of Fluorosurfactant Products, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

132.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, with evil intent, and with conscious and/or reckless disregard for the health and safety of others, and for the Plaintiff's property rights.

**SECOND CAUSE OF ACTION**
**STRICT LIABILITY- FAILURE TO WARN**

133.    Plaintiff realleges the allegations set forth in all preceding paragraphs.

134.    As a manufacturer of Fluorosurfactant Products, each Defendant had a duty to provide adequate warnings of the risks of these products to all persons whom its product

might foreseeably harm, including Plaintiff, the public, and public officials.

135.    Defendants' Fluorosurfactant Products were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control.

136.    Fluorosurfactant Products including AFFF are not reasonably safe for their intended and foreseeably uses for the following reasons:

a.    PFOA and PFOS cause extensive groundwater contamination, even when used in their foreseeable and intended manner;

b.    Even at extremely low levels, PFOA and/or PFOS render drinking water unfit for consumption;

c.    PFOA and/or PFOS pose significant threats to public health; and

d.    PFOA and/or PFOS create real and potential environmental damage.

137.    Defendants knew of the health and property damage risks associated with Fluorosurfactant Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with Fluorosurfactant Products including AFFF or an instruction that would have allowed Plaintiff to avoid the damage to its property.

138.    Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of Fluorosurfactant Products including AFFF in the vicinity of subterranean drinking water supplies, including contamination of public drinking water supplies with PFOA and/or PFOS, Defendants failed to issue any warnings, instructions, recalls, or advice regarding Fluorosurfactant Products including AFFF to Plaintiff, governmental agencies, or the public.

139.    Plaintiff would have heeded legally adequate warnings regarding AFFF had they been provided.

140.    Defendants could have warned of this danger but intentionally and knowingly concealed the certainty of contamination to maximize profits.

141.    Defendants learned of and concealed the dangers of Fluorosurfactant Products including AFFF after it manufactured, distributed, promoted, and sold these products, and yet did not issue warnings to those who had previously purchased these products, and thereafter continued to manufacture, distribute, promote and sell Fluorosurfactant Products including AFFF without warnings.

142.    Without adequate warnings or instructions, Defendants' Fluorosurfactant Products including AFFF were unsafe to an extent beyond that which would be contemplated by an ordinary person.

143.    PFAS reached waterways, wildlife, and water systems without any substantial change in condition and were in the same condition at the time of the alleged injury to Plaintiff's Property.

144.    It was foreseeable that PFAS would reach Plaintiff's Property.

145.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Plaintiff, its customers, and the public about the human and environmental risks posed by PFAS, and each day on which it fails to do so constitutes a new injury to Plaintiff.

146.    As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

147.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of subterranean drinking water supplies. Defendants committed each of the above described

28

acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, with evil

intent, and with conscious and/or reckless disregard for the health and safety of others, and

for the Plaintiff's property rights.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**

148.    Plaintiff realleges the allegations set forth in all preceding paragraphs.

149.    As a manufacturer and seller of PFOA/PFOS-containing AFFF, each Defendant

owed a duty to Plaintiff and to all persons whom its products might foreseeably harm to exercise

due care in the formulation, manufacture, sale, labeling, warning, and use of Fluorosurfactant

Products including PFOA/PFOS-containing AFFF.

150.    Defendants knew or should have known that PFOA and/or PFOS were leaching

from AFFF used in outdoor fire control exercises and fire emergency scenarios and contaminating

water resources.

151.    Although Defendants knew that PFOA and PFOS are toxic, can contaminate

water resources and are possible carcinogens, Defendants negligently:

a.    Designed, manufactured, formulated, handled, labeled, instructed, controlled,

marketed, promoted, and/or sold PFOA/PFOS-containing AFFF;

b.    Issued instructions on how AFFF should be used and disposed of, thus improperly

permitting PFOA and/or PFOS to contaminate the groundwater in and around the Plaintiff's

wells;

c.    Failed to recall and/or warn the users of AFFF of the dangers of groundwater

contamination as a result of standard use and disposal of this product; and,

d.    Failed and refused to issue the appropriate warning and/or recalls to the users of

PFOA/PFOS-containing AFFF, notwithstanding the fact that Defendants know the identity of

the purchasers of the AFFF.

152. Defendants failed to exercise ordinary care because: (a) a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties; (b) a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers; (c) a reasonably careful company would not continue to manufacture Fluorosurfactant Products in mass quantities and for the purposes that Defendants manufactured them or would warn of the dangers of using those products.

153. As a direct and proximate result of Defendants' negligence, the Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

154. Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of subterranean drinking water supplies. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, with evil intent, and with conscious and/or reckless disregard for the health and safety of others, and for the Plaintiff's property rights.

## FOURTH CAUSE OF ACTION
## <u>TRESPASS</u>

155. Plaintiff realleges the allegations set forth in all preceding paragraphs.

156. Plaintiff is the owner, operator and actual possessor of real property and improvements used for collecting, distributing, and supplying drinking water.

157. Defendants manufactured, distributed, marketed, and promoted Fluorosurfactant Products including PFOA/PFOS-containing AFFF with the actual knowledge and/or substantial

certainty that PFOA/PFOS-containing AFFF would, through normal use, release PFOA and/or PFOS that would migrate into subterranean groundwater, causing contamination.

158.    Defendants negligently, recklessly, and/or intentionally produced and marketed Fluorosurfactant Products including PFOA/PFOS-containing AFFF in a manner that caused PFOA and PFOS to contaminate Plaintiff's Property.

159.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

160.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for the Plaintiff's property rights.

## FIFTH CAUSE OF ACTION
## FRAUDULENT TRANSFER
(Against DuPont and Chemours only)

161.    Plaintiff realleges the allegations set forth in all preceding paragraphs.

162.    Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

163.    Prior to and during 2015, Defendant DuPont was in the business of producing, making, fabricating, designing, marketing, and selling chemical feedstocks containing PFOA and/or chemicals that can degrade into PFOA and/or other PFAS as part of their "performance chemicals business."

164.    Upon information and belief, in February 2014, DuPont formed The Chemours

31

Company as a wholly-owned subsidiary, and used it to spin off DuPont's "performance chemicals business" products line in July 2015.

165.    In addition to the transfer of the "performance chemicals business" products line, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFOA and other PFAS.

166.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manuf        acture, design, marketing, and sale of PFOA or other PFAS components for the use in AFFF products.

167.    As a result of the transfer of assets and liabilities to Chemours described in this Complaint, DuPont limited the availability of assets to cover judgements for all liability for damages and injuries from the manufacture, design, marketing, sale of PFOA or other PFAS components for the use in AFFF products.

168.    DuPont has (a) acted with intent to hinder, delay and defraud creditors, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably insufficient in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

169.    Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Plaintiff, that have been damaged as a result of DuPont's actions as described in this Complaint.

170.    Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

171.    Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.    Compensatory damages according to proof including, but not limited to:

a.      Costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFOA/PFOS contamination in Plaintiff's Property;

b.      Costs and expenses related to past, present, and future treatment and remediation of PFOA and/or PFOS contamination of Plaintiff's Property;

c.      Costs and expenses related to past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFOA and/or PFOS in Plaintiff's Property.

2.    Avoiding the transfer of DuPont's liabilities for the claims brought in this Complaint;

3.    Punitive damages;

4.    Consequential damages;

5.    Pre-judgment and post-judgment interest;

6.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a jury trial.


DATED:  June 12, 2023                              Respectfully submitted,

                                                   _____
                                                   Scott Summy (TX Bar 19507500)
                                                   **BARON & BUDD, P.C.**
                                                   3102 Oak Lawn Avenue, Suite 1100
                                                   Dallas, TX 75219-4281
                                                   Telephone: (214) 521-3605
                                                   Fax: (214) 520-1181
                                                   Cary McDougal (TX Bar 13569600)
                                                   Carla Burke Pickrel (TX Bar 24012490)
                                                   Jason Julius (TX Bar No. 24131101)

                                                   **COSSICH, SUMICH, PARSIOLA
                                                   & TAYLOR, LLC**
                                                   8397 Highway 23, Suite 100
                                                   Belle Chasse, LA 70037
                                                   Telephone: (504) 394-9000
                                                   Fax: (504) 394-9110
                                                   Philip F. Cossich, Jr. (LA Bar 1788)
                                                   Darren Sumich (LA Bar 23321)
                                                   David A. Parsiola (LA Bar 21005)
                                                   Brandon J. Taylor (LA Bar 27662)
                                                   Christina Cossich (LA Bar 32407)
                                                   Jody J. Fortunato (LA Bar 31728)
                                                   Luana N. Smith (LA Bar 35534)

                                                   D. Bruce Poole (MD Bar 25784)
                                                   **THE POOLE LAW GROUP**
                                                   29 W Franklin St.
                                                   Hagerstown, MD 21740

                                                   *Attorneys for Plaintiff*

34